```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION


Dashun Walker,                       )
                                     )
       Plaintiff,                    )
                                     )
                                     )
    v.                               )    No. 21 C 2939
                                     )
                                     )
City of Markham, an Illinois         )
municipal corporation,               )
                                     )
       Defendant.                    )
```

Memorandum Opinion and Order

Plaintiff Dashun Walker brings this employment discrimination suit against the City of Markham, alleging race discrimination and harassment, age discrimination, and retaliation in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Illinois Human Rights Act (IHRA), 775 Ill. Comp. Stat. 5/1-101 *et seq.* Walker also brings a common law retaliatory discharge claim. The City has moved for summary judgment. For the following reasons, the motion is granted in part and denied in part.

I.

A.

Walker, a Black man, was born in July 1974. He was hired by the City of Markham Police Department in 2001 and promoted to sergeant in 2013. During his time working for the department, Walker maintains that younger, white officers received more favorable treatment than he did, that he was subjected to racial harassment and, when he complained, retaliation.

In January 2019, Terry White, who served as Chief of Police from October 2018 until May 2022, recommended that Officer Eric Blohm, who is white and younger than Walker, be appointed as "interim lieutenant." According to Walker, this was effectively a promotion to the rank of lieutenant, but the City maintains that the rank of lieutenant had previously been abolished and that this was a temporary appointment, not a promotion. Blohm also received training at the Staff and Command Program at Northwestern University, which ran from September 2019 through January 2020. Walker was never offered that training opportunity.

On February 24, 2020, during a department roll call meeting, Deputy Chief Jack Genius compared the appearance of a Black person of interest to "Buckwheat," a Black character from a show. *See* Harris Dep., Def. Exh. K, ECF 67-14 at 16:22-17:1 (explaining who "Buckwheat" is). Walker complained to Genius, who is white, that he found the comment racist and offensive. Another Black officer,

2

Lt. Samuel Harris, was also present for the comment and advised Genius to stop talking. Harris later testified that he did not believe Genius intended the comment to be racist, that he was not offended by it, and that he told Genius to stop talking because he worried other officers might file a complaint. *Id.* at 16:9–17:16.

The day after the incident, Walker made a written complaint to the City Human Resources department. *See* First Internal Cmplt., Pl. Exh. E, ECF 80-9. In addition to the "Buckwheat" comment, Walker recounted in his complaint that at the same meeting, Genius had accused "you people"--Walker believes this was a reference to Black people--of throwing plastic radio holders into a bin, rather than setting them down. Walker also complained about prior comments by Genius, such as remarking that "you people love fried chicken and grape soda" and referring to a white police officer's shooting of an unarmed Black woman in her home as a "[r]ookie [m]istake." *Id.* at 3. Walker testified at his deposition that the food-related comments were made between 2008 and 2010. Walker Dep., Def. Exh. A, ECF 67-4 at 118:11-15.

In a second complaint Walker filed the same day, he accuses White of race and age bias, as well as harboring personal animus against Walker because of a dispute between them prior to White becoming Chief of Police. *See* Second Internal Cmplt., Pl. Exh. F, ECF 80-10. According to that complaint, White and others interfered with investigations Walker was a part of, withheld equipment and

3

training, removed him from certain assignments, and closely surveilled Walker's activities. The complaint also details actions aimed at preventing Walker from keeping current with department communications while he was recovering from a work-related injury for which he had sought workers' compensation. White also allegedly tried to prevent Walker from returning to work after recovering.

The complaints were investigated by Marion Williams, a Human Resources consultant for the City. Williams concluded that Genius in fact made the "Buckwheat" comment and that it was inappropriate in the workplace. She recommended that the entire police department attend a workplace sensitivity training, which she conducted. The report generated by Williams bears Walker's electronic signature, dated June 24, 2020. *See* Williams Report, Def. Exh. M, ECF 67-16. Walker claims that he never authorized the signature, in which his first name is misspelled "Dashaun." Walker Decl., ECF 80-3 ¶ 3.

The City emphasizes three work-related incidents during the relevant period for which Walker was disciplined. First, on February 2, 2020, Walker, while supervising a shift, attempted to make an investigative stop of two vehicles. During this attempt, one of the suspect vehicles struck Walker's vehicle from behind. White ordered Blohm to conduct an internal investigation into whether Walker had engaged in a "rolling roadblock" against department policy. Blohm also investigated Officer Cordelle

4

Clement, who was on patrol with Walker that evening and was involved in the incident.

White did not find Walker's report of the incident credible and, based on video footage that he reviewed and Blohm's report, determined that Walker had violated department policy. Walker claims that Blohm and White did not review all available footage and did not interview him, which he asserts would have compelled a different conclusion. Clement, when presented with a draft discharge petition based on the incident, resigned.

The second incident occurred on February 24, 2020. According to Harris, Walker had falsified time worked in relation to a court appearance at which he was to testify. Harris Dep. at 33:11–34:23; see also Def.'s L.R. 56.1 Stmt. (Def.'s Stmt.), ECF 67-1 ¶ 42 (noting that Walker was also thought to have been late signing in for work that day). Walker disputes this version of events. Based on this incident, Walker was suspended for one day.

Finally, on March 7, 2020, Genius and Walker responded to a call that a club called Couple's Choice was operating illegally. While there, Walker told a citizen that Genius "unfortunately" outranked Walker. And though Walker denies these allegations, Genius reported that Walker refused to stand at the front entrance of Couple's Choice when told to and turned his body camera off while speaking with the club's owner. White adopted Genius's recommendation of a three-day suspension for this alleged conduct.

5

On June 24, 2020, White filed a petition seeking Walker's discharge based on the rolling roadblock incident. *See* Discharge Pet., Def. Exh. N, ECF 67-17. Walker pursued arbitration to challenge that decision, as well as the discipline imposed for Walker's late court appearance and the Couple's Choice incident. Pending the outcome of the arbitration proceeding, Walker was suspended without pay. The arbitrator ultimately agreed that discipline was warranted in each instance, but not to the extent it had been imposed. *See* Arb. Award, Def. Exh. P, ECF 67-19. The arbitrator reduced the one-day suspension for the court appearance to a written warning, the three-day suspension for the Couple's Choice incident to a one-day suspension, and discharge for the rolling roadblock to suspension through the date of the arbitration award. *Id.* at 41. Pursuant to the arbitrator's decision, Walker was reinstated without backpay in August 2021.

B.

Walker filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on June 4, 2020, asserting race and age discrimination, as well as retaliation. Initial EEOC Charge, Def. Exh. F, ECF 67-9. Following presentation of the discharge petition at the end of June, he filed an amended charge to reflect that action. Amended EEOC Charge ("EEOC Charge"), Def. Exh. G, ECF 67-10. According to the EEOC Charge, the earliest date of discrimination was October 1, 2019, and the latest date

6

was June 4, 2020. *Id.* at 1. Walker also checked the box indicating that the discrimination was a continuing action. *Id.* The particulars of the EEOC Charge read as follows:

> I began my employment with Respondent on or about May 7, 2001. My current position is Sergeant. During my employment I was subjected to race and age based comments. I complained to Respondent. Subsequently, I have been disciplined pending discharge. Since filing the present charge, I have been discharged, had my unemployment denied and received a bad reference.
>
> I believe I have been discriminated against because of my race, Black, and in retaliation for engaging in protected activity, in violation of [Title VII].
>
> I also believe I have been discriminated against because of my age, 46 (YOB 1974), and in retaliation for engaging in protected activity, in violation of the [ADEA].

*Id.*

Walker received his right-to-sue letter from the EEOC on or about January 19, 2021. He commenced this lawsuit in state court on April 14, 2021, and it was removed to federal court on June 1, 2021.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I resolve all factual disputes in Walker's favor and give him "the

7

benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012) (citation omitted).

The City lodges several procedural arguments against certain claims. First, the City argues that Walker failed to bring his Title VII, ADEA, and IHRA claims within the allowed 90 days after receiving his right-to-sue letter from the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1) (requiring Title VII claims to be brought in that period); 29 U.S.C. § 626(e) (same for ADEA); 775 Ill. Comp. Stat. 5/7A-102(A-1)(3)(a) (same for IHRA claims investigated by the EEOC). But it appears that the City has the facts wrong. Walker submitted a postmarked envelope from the EEOC dated January 13, 2021. Pl. Exh. A, ECF 80-5. Thus, even if I apply the mailbox rule as urged by the City and assume Walker received the right-to-sue letter five days after it was postmarked, his state court complaint--filed on April 14, 2021--would be timely.

The City next attacks some of Walker's claims on exhaustion grounds. Generally, "a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Most parties filing charges with the EEOC are not attorneys, though, so courts construe the scope of an EEOC Charge liberally. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook County*, 804 F.3d

8

826, 831 (7th Cir. 2015) (citations omitted). Accordingly, a plaintiff "need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Cheek*, 31 F.3d at 500 (citation omitted). Rather, a claim is exhausted if it is "like or reasonably related to the EEOC charge, and can be reasonably expected to grow out of an EEOC investigation of the charges." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 565 (7th Cir. 2019) (citation and quotation marks omitted).

Walker's amended complaint alleges several discriminatory acts not referenced in the Charge, including: promoting or appointing Blohm to the position of interim lieutenant over Walker, Am. Cmplt., ECF 49 ¶¶ 9, 12; sending Blohm to train at Northwestern University's Staff and Command program but not Walker, *id.* ¶ 8; and handing out advantageous assignments and advancement opportunities to younger and white officers instead of Walker, *id.* ¶¶ 13-14. Walker has not exhausted his claims based on these events because there is nothing like them in the EEOC Charge. For a claim to be "like or reasonably related" to an EEOC charge, "the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." *Cheek*, 31 F.3d at 501 (emphases omitted). The conduct alleged in the EEOC Charge includes race-based comments, age-based comments, and retaliation. That is not the same conduct as the additional allegations in the amended complaint.

9

In the City's view, the EEOC Charge also does not contain enough information to give rise to a hostile work environment claim. But the EEOC Charge explicitly references race- and age-based comments, which, depending on the circumstances, can support a claim for hostile work environment. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901–03 (7th Cir. 2018) (concluding that racially charged comments gave rise to viable hostile environment claim). Read liberally, that is enough for Walker's claim.

The City further argues that Walker failed to exhaust his retaliatory discharge claim, but neglects to provide argument on why that claim, a "common-law tort in Illinois," *Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013), is subject to an exhaustion requirement. Indeed, there is some authority suggesting it is not. *See Bloch v. Alton Multispecialist, LTD*, No. 17-CV-560-SMY-RJD, 2018 WL 1517768, at *3 (S.D. Ill. Mar. 27, 2018).[1]

### III.

As to the merits, the City invokes the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is "[o]ne method a plaintiff may utilize to present"

---

[1] The City attacks this claim on the merits only in its reply brief. Arguments raised for the first time in reply briefs, however, are waived. *See Dye v. United States*, 360 F.3d 744, 751 n.7 (7th Cir. 2004) (citation omitted).

his evidence, but not the only one. *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (citing *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367–68 (7th Cir. 2019)). The key question, regardless of how a plaintiff chooses to present his evidence, is "'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson*, 892 F.3d at 894 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Walker's claims for race and age discrimination and harassment under the IHRA are analyzed under the same standards as used for Title VII and ADEA claims, respectively. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–83 (7th Cir. 2016) ("Illinois courts apply the federal Title VII framework to IHRA claims." (citation omitted)); *Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (holding that age discrimination claims under the IHRA should be analyzed in the same way as ADEA claims). Similarly, retaliation claims under the IHRA incorporate the standards for Title VII retaliation claims. *See Volling*, 840 F.3d at 382–83. Thus, discussion of Walker's Title VII and ADEA claims applies equally to his IHRA claims.

### A.

Plaintiffs pursuing a hostile work environment claim must show that "(1) they were subject to unwelcome harassment; (2) the

11

harassment was based on their race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson*, 892 F.3d at 900 (citing *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017)). The City challenges this claim on the third factor--whether the conduct was severe or pervasive--which depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citation omitted).

As an initial matter, the food-related comments Genius allegedly made between 2008 and 2010 about fried chicken and grape soda do not form part of the same "adverse action" as the remaining comments and fall outside the 300-day limitations period for filing a charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1) (establishing this 300-day limitations period). The Supreme Court has emphasized that because a hostile work environment generally "encompasses a single unlawful employment practice," so long as one harassing event took place in the limitations period, events outside the period may be considered too. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002). Applying *Morgan*, however, the Seventh Circuit has held that "[a] significant gap between alleged

12

incidents of discriminatory harassment can sever the hostile work environment claim." *Ford v. Marion County Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019) (citing *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017); *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004)). In *Milligan-Grimstad*, the court found that a gap of two or three years between harassment episodes rendered the episodes "isolated incidents" rather than "continuous conduct." 877 F.3d at 713; *see also Lucas*, 367 F.3d at 727 (finding gap of more than three years severed events). Here, Genius's comments from more than seven years prior to the other comments are too isolated to be considered along with the more recent ones.

The remining comments Walker relies on include: (1) Genius's statement, at an unspecified time, that a white police officer's shooting of an unarmed Black woman was a "[r]ookie [m]istake"; (2) Genius's February 24, 2020, use of the term "Buckwheat" to refer to a Black person of interest, and in discussing that term with Walker that day; and (3) Genius referring to Black people when he accused "you people" of throwing radio holders into the bin rather than placing them in the bin. Walker also points to two incidents for which he was not present, including White's recollection that Genius had used the term "Buckwheat" before to refer to a Black coworker's hair, White Dep., Def. Exh. B, ECF 67-5 at 24:13-25:11, and that Genius had said something along the lines of "Black Lives Matter doesn't matter," *id.* at 25:22-26:21. These statements are

13

given less weight than the statements for which Walker was present. *See Johnson*, 892 F.3d at 902 (observing that "evidence about comments that [plaintiffs] were told supervisors made" is weaker evidence than statements heard directly).[2]

Though these comments are inappropriate, obnoxious, and offensive, a factfinder could not conclude they were severe or pervasive. The comments heard by White occurred at the latest in October 2018, since White testifies that they were uttered before he became Chief of Police. Five possible incidents over the span of at least 16 months is not pervasive. *See King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 472 (7th Cir. 2012) ("[A] few incidents at the rate of one every four to six months (which is what King's evidence shows) cannot be called pervasive."). Nor were the comments severe. They were not physically threatening or humiliating; they fall closer to the "offensive utterance" end of the spectrum. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

---

[2] Walker adds that the City's "indifferent and falsified response" to his internal complaints about Genius exacerbated the hostility of the work environment. Pl. Resp., ECF 80 at 4. But he does not offer any evidence from which a jury could conclude that this meets the first factor for a hostile environment claim: that the conduct was harassment. Furthermore, even were I to throw this alleged conduct into the mix, it would not change my conclusion that Walker was not subjected to severe or pervasive conduct.

Walker urges that Genius's comments should be scrutinized more closely because of his rank. *See* Pl. Resp. at 4 (noting Genius "had a very high level supervisory rank" as Deputy Chief). It is true that the Seventh Circuit distinguishes between supervisors and coworkers "[i]n analyzing whether the use of racial epithets create a hostile work environment," and that comments by supervisors are more severe. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814–15 (7th Cir. 2022) (citations omitted). But beyond identifying Genius's title at the time, Walker offers no evidence that Genius was his "supervisor" for Title VII purposes. *See Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (holding that a supervisor for Title VII purposes is one with power to directly affect plaintiff's employment--including power to "hire, fire, demote, promote, transfer, or discipline" the employee (citation and quotation marks omitted)); *see also Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116–17 (7th Cir. 2022) (distinguishing between "direct supervisors" and "non-direct supervisors" in Title VII case).

Even were I to assume Genius was Walker's direct supervisor, the offensive comments would still not rise to the requisite level to be actionable. The comments--other than perhaps the "you people" comment--were not aimed directly at Walker. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) (observing that comments not "directed towards" a plaintiff are less severe);

15

*Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 602 (7th Cir. 2014) ("When harassing statements are directed at someone other than the plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." (citation and quotation marks omitted)). Indeed, the Seventh Circuit has found that even comments more explicit than those here, made directly to a plaintiff by a supervisor do not pass muster. *See Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 846–48 (7th Cir. 2009) (granting summary judgment even where supervisor directly called plaintiff a "gorilla" and told him that he would not lose his job because of affirmative action, and where non-supervisor coworker repeatedly called plaintiff "black African-American" and "black man" for 14 months).

Though Walker does not expressly frame his ADEA claim in harassment or hostile environment terms, he does put forth what he believes is a discriminatory age-based comment made by White.[3] Walker claims White referred to him as "the old fat guy." Walker Dep., ECF 67-4 at 153:17–154:3. That one comment is not enough to satisfy the "severe or pervasive" requirement of a hostile work

---

[3] The Seventh Circuit has "assumed, without deciding, that a hostile work environment claim can be brought under the ADEA." *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022) (citing cases). Any other bases for a hostile environment claim under the ADEA here are barred for the exhaustion reasons discussed above.

environment claim, particularly where Walker did not personally hear White make the comment.

B.

To succeed on a Title VII retaliation claim, Walker must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (citation and quotation marks omitted). Walker alleges multiple incidents that meet this standard. As to all of them, it is undisputed that he satisfies the first element because he filed an internal complaint and his EEOC Charge.

Walker's claim based on increased surveillance of his performance fails, however, because such activity, absent tangible job consequences, does not constitute a materially adverse action. *See Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) (concluding that actions that do not themselves produce injury are not adverse actions); *Peters v. Wal-Mart*, 876 F. Supp. 2d 1025, 1035 (N.D. Ind. 2012) (finding close surveillance of an employee does not constitute adverse employment action), *aff'd sub nom. Peters v. Wal-Mart Stores E., LP*, 512 F. App'x 622 (7th Cir. 2013). Still, surveillance "may well be relevant evidence of retaliatory intent behind a more concrete adverse action." *Poullard*, 829 F.3d at 857 (citing *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003)).

17

Walker alleges in his amended complaint that, as a further act of retaliation, the City interfered with his ability to work for another police department during his suspension. The City includes in its statement of facts (and Walker admits) that White has written letters confirming Walker's employment with the City to be given to other police agencies and has never refused to do so. Def.'s Stmt., ECF 67-1 ¶ 70. Walker fails to provide evidence in support of this aspect of his claim, so it fails.

Walker also asserts that several aspects of the investigation following the rolling roadblock incident were retaliatory. Some of these--like the failure to give Walker notice of the investigation, the assignment of Blohm to lead the investigation, and the adoption of Blohm's findings--do not themselves constitute adverse employment actions. The discipline stemming from the investigation, however--attempted discharge that essentially resulted in suspension without pay--certainly does. The parties disagree over whether there is evidence from which a jury could infer a causal connection between Walker's filing of complaints against the City and his suspension.

Walker argues that the timing of his suspension was suspicious in two ways. First, because his allegedly falsified signature on Williams' report bears the same date as his discharge petition. *Compare* Williams Report, ECF 67-16, *with* Discharge Pet., ECF 67-

18

17. Second, the discharge petition was brought just 20 days after Walker filed his initial EEOC charge.

Circumstantial evidence that suggests suspicious timing may support inference of a causal link between engaging in protected activity and an adverse employment action, *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019), though it is "rarely enough to create a triable issue" on its own, *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (citation and quotation marks omitted). Walker's additional evidence includes that the arbitrator determined that discharge was not a reasonable disciplinary measure for the rolling roadblock incident. Arb. Award, ECF 67-19 at 40. Additionally, Genius, who is now Chief of Police, testified that he is unaware of any officer other than Walker and Clement for whom the City sought discharge for violation of the department's police pursuit policy, despite that such violations are common, Genius Dep., Def. Exh. I, ECF 67-12 at 60:8-61:17, an understanding Walker shares, Walker Decl., ECF 80-3 ¶ 4.

For its part, the City contends that White had intended to bring a discharge petition against Walker well before Walker filed his EEOC Charge, and that Walker was aware of that fact. In the City's view, this negates any suspicious timing arguments because if White had already decided to discharge Walker prior to the filing of Walker's EEOC Charge, then the EEOC Charge could not

have played a role in that decision. The City also points out that it sought discharge of the other officer involved in the rolling roadblock, who is also Black, and there is no evidence that he had engaged in protected activity. A factfinder might find the City's arguments persuasive, but might instead conclude based on Walker's evidence referenced above that White's final decision to seek Walker's discharge did not come until after June 4, 2020, even if it was an option he was considering before then. The bottom line is that Walker has provided some evidence from which a jury could find for him.

IV.

For the foregoing reasons, the City's motion for summary judgment is granted as to Counts I-IV. It is denied as to Walker's various retaliation claims, Counts V-IX. Walker may continue to pursue these retaliation claims consistent with this opinion.

**ENTER ORDER:**

*Elaine E. Bucklo*
**Elaine E. Bucklo**
United States District Judge

Dated: June 9, 2023